FILED

JUL 17 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION
OF CHAIN DRUG STORES
413 North Lee Street
Alexandria, VA 22314,

and

NATIONAL COMMUNITY
PHARMACISTS ASSOCIATION
205 Daingerfield Road
Alexandria, VA 22314

Plaintiffs,

v.

THE HONORABLE
TOMMY G. THOMPSON,
in his official capacity as
SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES
200 Independence Avenue, SW
Washington, DC 20201,

and

THOMAS A. SCULLY,
in his official capacity as
ADMINISTRATOR,
CENTERS FOR MEDICARE
& MEDICAID SERVICES
200 Independence Avenue, SW
Washington, DC 20201

Defendants.

CASE NUMBER 1:01CV01554

JUDGE: Paul L. Friedman

DECK TYPE: Administrative Agency Review

DATE STAMP: 07/17/2001

**COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF**

1

Plaintiffs, National Association of Chain Drug Stores ("NACDS") and National Community Pharmacists Association ("NCPA"), for their complaint against defendants the Honorable Tommy G. Thompson, Secretary (the "Secretary") of the United States Department of Health and Human Services ("HHS"), and Thomas A. Scully, Administrator (the "Administrator") of the Centers for Medicare & Medicaid Services ("CMS"), assert as follows:

## INTRODUCTION

1. This complaint concerns clandestine and unlawful action by HHS and CMS in devising and implementing a program that would create new and substantial federal involvement in the private prescription drug marketplace for Medicare beneficiaries in the United States. Over the past several months, representatives of these agencies met secretly with representatives of a small group of the nation's largest and most profitable pharmacy benefits managers ("PBMs"). (PBMs are private entities that contract with health plans or plan sponsors to provide the claims processing and administrative services involved in the operation of prescription drug programs.) These PBMs – Merck-Medco Managed Care, L.L.C., Express Scripts, Inc., Caremark, Inc., Wellpoint Health Networks, Inc., and AdvancePCS – control approximately 80% of the PBM market, and up to 90% of the mail-order pharmacy business. The result of those closed-door, back-room meetings is the Medicare Rx Drug Card Program (the "Card Program") announced on July 12, 2001. Under the Card Program, Medicare will "endorse" prescription drug discount cards issued by PBMs and perhaps others, so long as the companies satisfy certain requirements. The defendants will spend taxpayer money to market the PBMs' private discount cards to Medicare beneficiaries. The PBMs will form a "consortium" to share pricing information, pass judgment on their competitors' marketing materials, and restrict Medicare beneficiaries from owning more than one Medicare-endorsed discount card. The

PBMs will profit by: charging Medicare beneficiaries enrollment fees; extracting price discounts from pharmacies and rebates from manufacturers that need not be shared with Medicare beneficiaries; and steering beneficiaries to mail-order pharmacies owned by the PBMs. The Card Program represents a new and unprecedented interference by government in the private marketplace for prescription drug discount cards for Medicare beneficiaries. Nevertheless, HHS and CMS created it in secret meetings without any authority from Congress and failed to follow even the basic procedural requirements of the Administrative Procedure Act. The resulting unlawful Card Program will cause substantial harm to plaintiffs, their members, and Medicare beneficiaries.

2. The Card Program scheme was developed by HHS and CMS officials as a result of secret meetings they held with a small group of the largest PBMs in the country. These meetings were held over a period of several months prior to President George W. Bush's high-profile Rose Garden announcement of the Card Program on July 12, 2001, which was attended by the small group of PBMs. At these secret meetings, the participants developed the standards for participation in the Card Program, all of which are designed to benefit substantially the large PBMs to the exclusion of other potential participants in the Program. Plaintiffs, their members and senior citizens, all of whom will be directly affected by the Card Program, were purposefully excluded by defendants from attending these meetings.

3. Following these clandestine meetings and the President's announcement, CMS published the Notice of Application for the Card Program in the Federal Register on July 16, 2001 (as placed on display in the Federal Register offices). As outlined in the Notice, a number of standards are set out for participation in the Card Program, none of which relates to the amount of the discount or the actual benefit, if any, afforded Medicare beneficiaries. On the

contrary, the standards will actually limit the ability of beneficiaries to receive discounts by restricting their ability to choose more than one discount card in the marketplace.

4. Neither HHS nor CMS will provide funding for any discounts received by Medicare beneficiaries under the Card Program. Instead, members of NACDS and NCPA, as well as other private entities, would be coerced into funding the discounts to be provided by this federally endorsed and regulated initiative.

5. In establishing and implementing the Card Program, HHS has violated federal law by exceeding the statutory authority granted to it by the Social Security Act; failing to comply with the procedural requirements of the Administrative Procedure Act; adopting regulatory standards that are arbitrary, capricious, and an abuse of discretion; failing to comply with the requirements of the Federal Advisory Committee Act; and unlawfully delegating regulatory authority under the Card Program to a group of private, self-interested card issuers. Plaintiffs NACDS and NCPA ask the Court to declare the Card Program unlawful and to enjoin defendants from taking any action to implement the Program.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the laws of the United States. This suit is brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 701-706.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because one or more of the defendants resides in this judicial district and a substantial part of the events giving rise to plaintiffs' claims occurred in this judicial district.

## PARTIES

8. Plaintiff NACDS is an association organized and existing under the laws of the Commonwealth of Virginia. Founded in 1933 and based in Alexandria, Virginia, NACDS membership consists of over 180 retail community pharmacy companies. Collectively, community pharmacy companies comprise the largest component of pharmacy practice with over 100,000 pharmacists. The community pharmacy industry is comprised of more than 20,000 traditional chain drug stores, 7,800 supermarket pharmacies and 5,300 mass merchant pharmacies.

9. NACDS's members operate over 33,000 retail community pharmacies with annual sales totaling over $400 billion. Chain-operated community retail pharmacies fill nearly 63% of the more than three billion prescriptions dispensed annually in the United States.

10. NACDS represents the views and values of the country's leading community retail pharmacies. NACDS is committed to, inter alia, advancing the interests of its member organizations with respect to issues relating to federal and state health policy issues, including issues respecting federal health care programs, such as Medicare and Medicaid. Moreover, NACDS advocates the views of its members during congressional and administrative deliberations of policies and issues affecting retail community pharmacies.

11. NACDS brings this suit on behalf of its members. NACDS members will be injured individually by the Secretary's adoption of the Card Program, and CMS's review, approval and endorsement of discount prescription cards under the Card Program. Neither the claims asserted nor the relief demanded necessitates participation of individual NACDS members for the fair and just adjudication of this lawsuit.

12. NCPA is an association organized under the laws of the Commonwealth of Virginia, with its principal offices in Alexandria, Virginia. Founded in 1898 as the National

Association of Retail Druggists, NCPA represents the pharmacist owners and managers, and 60,000 employee pharmacists of 25,000 independent community pharmacies across the United States, including independently owned chains and franchises.

13. The nation's independent community pharmacists are small business entrepreneurs and multifaceted health care providers who represent a vital part of the United States' health care delivery system. NCPA represents the professional and proprietary interests of independent community pharmacists and promotes and defends those interests, including those pertaining to state and federal health care programs.

14. NCPA brings this suit on behalf of its members. NCPA members will be injured individually by the Secretary's adoption of the Card Program, and CMS's review, approval and endorsement of discount prescription cards under the Card Program. Neither the claims asserted nor the relief demanded necessitates participation of individual NCPA members for the fair and just adjudication of this lawsuit.

15. Together, NACDS and NCPA represent virtually all retail community pharmacies in the United States.

16. Defendant Tommy G. Thompson, the Secretary of HHS, is responsible for the Card Program, and is also charged with implementing provisions of Title XVIII of the Social Security Act, as amended, 42 U.S.C. § 1395 et seq. (the "Medicare Program"). The Secretary administers the Medicare Program and will administer the Card Program through the Administrator of CMS. The Secretary is sued in his official capacity only.

17. Defendant Thomas A. Scully is the Administrator of CMS. He is sued in his official capacity only.

## BACKGROUND

**The Medicare Act**

18. Title XVIII of the Social Security Act establishes a comprehensive program of health insurance benefits, commonly known as Medicare, for individuals aged 65 and older, as well as for certain others who come within its terms, including persons with disabilities and persons with end stage renal disease. 42 U.S.C. §§ 1395-1395ggg; 42 U.S.C. § 426-1(a); 42 U.S.C. § 426(a).

19. The Medicare Program is administered by CMS.

20. In broad terms, Part A of the Medicare Program (the hospital insurance program) covers care provided by institutional health care providers, including inpatient hospital care, skilled nursing facility care, hospice care, and home health care. 42 U.S.C. §§ 1395c-1395i-5.

21. Part B (the supplementary medical insurance program) pays for various medical services not covered by Part A, including physician services to individual patients, certain hospital outpatient services, home health and outpatient ambulatory services, speech and physical therapy, rehabilitation, and other diagnostic care. 42 U.S.C. §§ 1395j-1395w-4.

22. Medicare does not pay for prescription drug coverage (other than inpatient prescription drugs and a limited number of enumerated drugs provided in other than an inpatient setting). 42 U.S.C. § 1395y; 42 C.F.R. § 411.15.

23. At the inception of the Medicare Program, and in subsequent amendments thereto, Congress has acknowledged the complexity of the Program and the need for a wide range of expertise and resources in meeting the needs of Medicare beneficiaries. Accordingly, on numerous occasions, Congress has expressly authorized the Secretary to work with the private sector to provide covered benefits to beneficiaries.

24. For example, under Part A, Congress explicitly authorized the Secretary to enter into agreements with private organizations (commonly known as fiscal intermediaries) for the determination of payments due under Part A and for making such payments. 42 U.S.C. § 1395h. The statute provides express authority for these agreements and establishes guidance for the Secretary as to the nature and content of the agreements. Id.

25. Similarly, under Part B, Congress authorized the Secretary to enter into contracts with organizations known as carriers to perform certain functions necessary to administer Part B benefits. 42 U.S.C. § 1395u. The statute details what responsibilities may be delegated to the carrier and what provisions the contract must contain, including continued accountability to the Secretary. Id.

26. Under the Medicare+Choice program, or Part C of Medicare, Congress authorized qualified managed care organizations to provide an alternative system for delivering health care services to Medicare beneficiaries. Here again, Congress, through the Medicare Act, has provided the Secretary with the necessary authority to contract with these private organizations. See 42 U.S.C. § 1395w-21 et seq.

27. In the Health Insurance Portability and Accountability Act of 1996, Congress created the Medicare Integrity Program (MIP), which was designed to review the processing and payment of claims under the Medicare Program. See 42 U.S.C. § 1395ddd. Congress expressly granted the Secretary broad contracting authority to use private entities to carry out the activities of the program. It also imposed requirements on the Secretary, explicitly limiting the types of entities that the Secretary could contract with to perform MIP functions. Id.

28. The Medicare Act also regulates Medicare supplement insurance policies, commonly known as Medigap policies, by instructing a private association, the National

Association of Insurance Commissioners, to adopt model standards which then, in turn, are adopted by the states as regulations. 42 U.S.C. § 1395ss. These Medigap policies, which do not require the expenditure of Medicare monies, provide coverage exclusively to Medicare beneficiaries for expenses not covered by Medicare.

29. Further, the Medicare Act contains examples of Congress bestowing specific contracting authority on the Secretary. One such authority, 42 U.S.C. § 1320c, establishes standards and processes that the Secretary must follow in contracting with private individuals and entities to review the quality of medical care provided to Medicare beneficiaries.

30. Significantly, where Congress has allowed private individuals or organizations to serve a quasi-regulatory purpose, it has done so expressly in the Medicare Act. Under the Medicare Program, provider entities are required to meet certain conditions of participation in order to participate in the program. Congress has expressly granted to private accreditation organizations "deeming authority," under which these organizations' accreditation of providers satisfies the conditions of participation. 42 U.S.C. § 1395bb.

**Medicare Rx Discount Card Program**

31. On July 12, 2001, President George W. Bush announced the Medicare Rx Discount Card Program. The Secretary and Administrator have responsibility for overseeing implementation and administration of the Card Program. Under the Card Program, Medicare beneficiaries would be permitted to choose only one of several Medicare-endorsed prescription drug discount cards, which would be offered by private entities whose discount cards have been reviewed and approved by CMS. By having CMS endorse certain private cards over others, HHS intends to grant these preferred market participants a competitive advantage vis-à-vis other discount card issuers who lack endorsed cards.

32. On or about July 16, 2001, HHS published a Notice of Application in the Federal Register requesting that by August 27, 2001 all interested parties submit applications to participate in the Card Program. In the Notice, HHS stated that in order for a private entity to participate in the Card Program and for that entity's program to be endorsed by Medicare, certain requirements must be met.

33. Specifically, participation in the Card Program would be limited to entities that meet a number of restrictive standards, which were devised by HHS in conjunction with a small committee of large, private PBMs (the "Committee"). The Committee consisted of five PBMs, Merck-Medco Managed Care, L.L.C., Express Scripts, Inc., Caremark, Inc., Wellpoint Health Networks, Inc., and AdvancePCS, which control 80% of the PBM market.

34. The HHS standards would exclude from participation in the Card Program all entities other than those that: (1) have been in the discount drug card or PBM business for five years; (2) currently have either two million covered lives if a national organization, or one million if a regional entity; and (3) can meet certain solvency requirements. Any entity seeking to participate in the Card Program also must demonstrate the financial means to commit unspecified funds to a private consortium that will be delegated authority to regulate the Card Program.

35. Additionally, to receive Medicare's endorsement, a discount card issuer must, inter alia, charge no enrollment fee, or, at most, an enrollment fee not to exceed $25. The issuer of the card also must: (1) agree to enroll all Medicare beneficiaries seeking to participate in the program; (2) provide a discount on at least one brand and/or generic prescription drug in each therapeutic class; (3) offer a comprehensive national or regional network of retail pharmacies,

with additional mail-order or Internet service at the sponsor's option; and (4) provide a specified measure of "customer service" to beneficiaries.

36. None of these standards bears any rational relation to the amount of the discount or the actual benefit, if any, afforded Medicare beneficiaries. In fact, the standards actually restrict beneficiaries' access to discounts by preventing beneficiaries from holding more than one endorsed card.

37. Only discount card issuers meeting these requirements, imposed by HHS as a result of secret consultations with the Committee, will be endorsed by Medicare, and only those issuers will be permitted to use the Medicare name in marketing to beneficiaries. The Secretary has acknowledged that Medicare's name recognition is so strong that it is unlikely to be duplicated in the private market. Endorsed issuers will also reap the benefits of CMS's substantial promotional efforts on their behalf. In addition, endorsed issuers will be permitted to market additional health care services to enrolled Medicare beneficiaries. It is highly unusual if not unprecedented for the government to endorse a private company or product. In the absence of statutory authority, the Medicare name, which seniors have relied on and trusted for over thirty-five years, should not be utilized by private companies to exploit for their private monetary benefit.

**Clandestine Meetings to Develop the Card Program**

38. As noted above, HHS relied on the Committee, whose members collectively comprise over 80% of the PBM market, to meet secretly and develop the illegal Card Program and its regulatory standards. Based on discussions with HHS and White House officials, NACDS has learned that the Committee's discussions were purposely kept secret from the public

and other interested parties, including NACDS, NCPA, their members, drug manufacturers, and Medicare beneficiaries that will be disadvantaged by the Card Program.

39. While HHS states that entities other than PBMs would be eligible to participate in the Card Program, HHS met privately only with the Committee and its small group of PBM members, and not with pharmacies and beneficiaries who could have offered input on the establishment of the Card Program's requirements. Thus, rather than meet with a representative group of the interested parties that would be directly affected by the Card Program, HHS met secretly with a handful of PBMs that ultimately will benefit the most, and perhaps exclusively, from the Card Program that they helped develop.

40. HHS also sought to insulate itself from public review of the Card Program by failing to publicly solicit comment on the Card Program. Had HHS done so, interested parties of all types, including plaintiffs, consumers and state attorneys general, who have conducted numerous investigations of PBMs, could have provided valuable input to the agency.

**Harm to Medicare Beneficiaries**

41. Under the Card Program, all Medicare beneficiaries would be permitted to enroll to receive a Medicare-endorsed drug discount card, with enrollment being limited exclusively to Medicare beneficiaries. However, Medicare beneficiaries would be prohibited from enrolling in more than one Medicare-endorsed card at a time, and would be allowed to change from one card to another only once every six months. Medicare-endorsed issuers would be permitted by CMS to charge a one-time enrollment fee of up to $25 to cover initial enrollment activities.

42. There are currently a number of drug discount cards available in the private marketplace. Discount cards of many varieties are offered in the marketplace not only by PBMs, but also by numerous chain drug stores. Presently, there are no restrictions on the number of

such discount cards that an individual may utilize. Thus, the enrollment restrictions imposed by HHS will reduce beneficiary choice of the discount cards that best suit each beneficiary's individual needs.

43. Numerous studies indicate that a substantial portion of Medicare beneficiaries use prescription drugs incorrectly. Promotion of mail-order pharmacies by the Card Program will likely lead to even greater misuse and waste of medications, which will result in increased costs to the Medicare Program since beneficiaries who receive their drugs by mail-order, rather than through direct contact with a pharmacist, are even less likely to receive the necessary counseling that community pharmacists provide. Beneficiaries will be harmed by reduced interaction with their trusted local pharmacists.

44. There is substantial evidence that prescription drug discount cards do not pass savings along to the patients who enroll in such programs. Specifically, a July 12, 2001 Congressional report concluded that the savings realized under five private discount drug card programs, including some programs sponsored by members of the Committee, were minimal or nonexistent. These savings are negligible, inter alia, because the discount card issuers extract rebates from pharmaceutical manufacturers, which are not passed on to consumers, and, indeed, often result in steering beneficiaries to higher cost drugs. Several states, including Arkansas, Georgia, Idaho, Iowa, Kansas, South Carolina, South Dakota, California, and Washington, have enacted laws or issued policy statements regulating discount cards. In Iowa, the Attorney General's office has issued an advisory warning consumers that some discount card programs offer illusory benefits. Further, under the now defunct Washington State-sponsored prescription drug discount card program (called "AWARDS"), which was similar to the Card Program, one senior without insurance coverage for prescription drugs signed up for the AWARDS card only

to discover that the diabetes drug he once bought for $18.99 without insurance now cost him $28.63 with the AWARDS card.

**Limited Participation in the Card Program**

45. The restrictive requirements imposed by HHS will limit participation in the Card Program to a small number of large players in the PBM marketplace. All of the PBMs that were invited to participate in the Committee that designed the Card Program with HHS can satisfy the standards for endorsement, and, according to the Secretary, all have indicated their willingness to participate in the Card Program. Indeed, the Secretary has publicly acknowledged that HHS has already made "deals" with each member of the Committee to participate in the Card Program.

46. Competitors of these large PBMs, many of which are NACDS or NCPA members, will be unable to meet the requirements imposed by HHS for participation in the Card Program. Although numerous companies, including many chain drug stores and some independent pharmacies, currently issue prescription drug discount cards to substantial numbers of seniors, they will not be able to meet the arbitrary requirement that Medicare-endorsed regional card issuers cover one million lives or that endorsed national issuers cover two million lives. Similarly, new market entrants and entities that have provided pharmacy benefit management services for less than five years would be precluded from participating by virtue of the five-year requirement developed by HHS and the Committee.

47. Because the overly restrictive and unnecessary standards developed by HHS and the Committee would preclude participation by many of NACDS's and NCPA's members, the Card Program would create an unfair competitive advantage for the Committee members since these organizations would have Medicare's imprimatur as endorsed discount card issuers. Because HHS's unlawful Card Program favors these other entities, NACDS's and NCPA's retail

pharmacy members will experience significant erosion of already narrow profit margins on drugs and, perhaps more significantly, lose a substantial portion of their customer base to Medicare-endorsed mail-order pharmacies.

48. The Secretary has publicly acknowledged that the Card Program will result in reduced margins for retail pharmacies. According to the Secretary, discounts will be paid for by "lost profits to the pharmaceutical companies as well as to the drugstores."

**CMS's Regulation of the Card Program and Associated Expenditures**

49. While private entities would sponsor prescription drug discount cards under the Card Program, the Secretary, through CMS and the Administrator, initially will be actively engaged in administering the new program. Specifically, CMS will review applications from private sponsors to assess whether the cards they propose satisfy the standards and requirements discussed above. Upon a finding that the issuer meets these standards, CMS will certify the program as a Medicare-endorsed program, thereby permitting the issuer to market its card as being preferred by the Medicare Program over other non-endorsed cards. CMS claims it will conduct a review of participating issuers annually to ensure continued compliance with the requirements established for Medicare-endorsed cards.

50. In addition, CMS intends to contract with an outside entity to develop guidelines for the review of marketing materials proposed by the participating discount card issuers to ensure that such materials convey accurate information. According to the Secretary, this initiative will require funding by the federal government.

51. CMS will have a significant role in disseminating information about Medicare-endorsed private discount cards to Medicare beneficiaries. CMS will provide such information on its www.medicare.gov website, its "1-800-MEDICARE" information hotline, and through

other mediums. Moreover, CMS will actively promote and market issuers that have secured Medicare's endorsement, including referring callers to "1-800-MEDICARE" to private, Medicare-endorsed issuers' enrollment centers. The Secretary has indicated that the funding for such educational and promotion activities will come from the agency's $35 million Medicare beneficiary education campaign.

**Role of the Consortium**

52. Qualified applicants will be required to participate in and fund a private consortium of all Medicare-endorsed discount card issuers (the "Consortium"). By November 1, 2001, the Consortium is required to implement a system to ensure that Medicare beneficiaries are enrolled in only one Medicare-endorsed discount card at a time.

53. After the initial year of the Card Program, CMS will delegate authority previously reserved for CMS to the Consortium, including the authority to disseminate comparative information about the Consortium members' programs. As part of this requirement, the Consortium will publish information on endorsed issuers' specific drug prices, formularies and networks both in hard copy and on the Consortium's website.

54. Beginning on September 1, 2002, the Consortium will be required to review marketing materials used by Medicare-endorsed discount card issuers to ensure that they convey accurate information, and that these issuers are delivering the services promised. According to HHS, CMS will continue to be active in the Consortium's activities, but its only role will be to confer endorsement on issuers that meet the Card Program's requirements.

**Harm to Plaintiffs and their Members**

55. Plaintiffs and their member pharmacies will be significantly harmed by the Card Program described herein. This harm includes, but is not limited to, the following:

(a) The Card Program limits participation to entities that meet certain arbitrary standards, e.g., entities must have been in business for five years and have at least one million covered lives, regardless of their ability to provide meaningful discounts to seniors. These standards arbitrarily and capriciously prevent both plaintiffs and certain of their member organizations, which are otherwise able to provide meaningful discounts to seniors, from participating in the Card Program, causing irreparable harm to them.

(b) The scheme created under the Card Program will cause financial harm to the members of NACDS and NCPA, which operate pharmacies throughout the United States. The Card Program will enfranchise a small group of large PBMs, which, acting with the imprimatur of HHS and CMS, will enjoy substantial market power. If the Card Program works as HHS and CMS intend, these large PBMs will then be in a position to affect prices charged by pharmacies, by denying them their customer base of Medicare beneficiaries unless the pharmacies agree to the prices prescribed by the PBMs under the Card Program. The already thin profit margins of plaintiffs' member pharmacies (which average 1-2 %) will be further eroded and some smaller pharmacies will no longer be able to continue in business.

(c) The Card Program will cause further financial harm to NACDS and NCPA members by its preference for PBMs which offer mail-order pharmacy services (of which the Committee controls almost 90% of the market). By eliminating a customer's visit to a pharmacy, mail-order services eliminate both the individual service that a pharmacist can provide to a customer and the opportunities that pharmacies have to sell non-pharmacy items to customers in their stores. These latter sales are often the only way a pharmacy can stay profitable, as there are no profit margins on some prescription drugs.

## COUNT I (Against All Defendants)

**The Secretary's Actions Violate the Administrative Procedure Act by Exceeding the Authority Granted by the Social Security Act**

56. Paragraphs 1-55 are incorporated by reference herein.

57. The Secretary, through the Administrator, has established a program targeted exclusively at individuals who are eligible to receive benefits under Title XVIII of the Social Security Act. Under the Card Program, the Secretary has imposed requirements on private entities seeking to participate in this Medicare-related initiative. An entity's applications for participation in the Card Program will be reviewed by CMS, and if approved, will earn the entity Medicare's endorsement as a preferred discount card issuer. Moreover, CMS will review and approve these private entities' marketing materials, and actively market endorsed issuers to Medicare beneficiaries through its existing Medicare information dissemination infrastructure.

58. By regulating in this manner, the Secretary has exceeded and will exceed the statutory authority granted to him by Congress in the Social Security Act. Nowhere does the Act explicitly or implicitly authorize the Secretary to create the Card Program, regulate private entities under the rubric of Title XVIII authority, or use funding appropriated to HHS and CMS to fulfill the purposes of a program not authorized by Title XVIII. Significantly, in the Notice of Application and other pronouncements regarding the Card Program, the Secretary has not cited any legal basis for his actions.

59. In addition, as discussed above, the Secretary has enlisted private entities to administer the Card Program, which involves federal funding and a class of enrollees recognized specifically under the Medicare Act. As described above, on occasion, Congress has authorized the use of private entities to provide services to beneficiaries or otherwise assist in the administration of the Medicare Program. In each such instance, it has done so pursuant to

express statutory authority and has prescribed parameters for the Secretary's interaction with and reliance on the private sector. Here, no such congressional authorization or parameters exist. Accordingly, the Secretary has exceeded the statutory authority granted to him by establishing and implementing the Card Program.

60. Moreover, the Secretary's Card Program is inconsistent with the purposes of the Medicare Program. Congress created the Medicare Program in 1965 to provide health insurance to elderly and certain disabled Americans. Here, the Secretary has foisted responsibility for such assistance on the backs of community pharmacies, without statutory authorization to do so. Indeed, the vast majority of the drugs that will be available under the Card Program are not covered benefits under Title XVIII.

61. Creation and administration of the Card Program requires the expenditure of federal funds. Congress has appropriated funds to CMS to carry out its statutory directives under the Medicare Act; no such funding has been appropriated to develop or implement the Card Program. The use of such appropriated funds is unlawful insofar as such funds are used to implement any aspect of the Card Program.

62. For the reasons described above, the Secretary's conduct is contrary to law.

63. The Secretary's implementation of this illegal Card Program has caused and will continue to cause substantial, imminent, and irreparable injury to NACDS's and NCPA's members unless the Card Program is declared unlawful and the defendants are permanently enjoined from implementing the Program.

## <u>COUNT II (Against All Defendants)</u>

### The Card Program Was Adopted in Violation of the Rulemaking Requirements of the Administrative Procedure Act

64. Paragraphs 1 through 63 are incorporated by reference herein.

65. The rulemaking provisions of the Administrative Procedure Act, 5 U.S.C. § 553(b), provide that:

> General notice of proposed rule making **shall** be published in the Federal Register. . . . The notice shall include -
>
> (1) a statement of the time, place and nature of public rule making proceedings;
>
> (2) reference to the legal authority under which the rule is proposed; and
>
> (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

(Emphasis supplied).

66. Section 553(c) further requires an agency to:

> give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation . . . [and to] incorporate in the rules adopted a concise general statement of their basis and purpose.

67. The Card Program established by HHS in July 2001 clearly fits within the APA's definition of a substantive rule. As such, it may not be adopted without observance of the APA's notice and comment requirements.

68. The defendants failed to observe the notice and comment requirements in adopting the Card Program. Thus, the Card Program is illegal.

69. As set forth in the documents released by the HHS on July 12, 2001, the Notice of Application of July 16, 2001, and the documents cited therein, HHS and CMS have created a program with binding norms for the affected parties, including but not limited to, the following:

<u>First</u>, Medicare beneficiaries will be <u>limited</u> to enrolling in one discount card program;

Second, the right of Medicare beneficiaries to switch from one program to another will be limited to twice per year on specified dates;

Third, discount card issuers will be required to meet specific standards, including:

- Having been in the business for five years, thus barring the participation of any new entrants;
- Having at least one or two million covered lives currently (depending on whether it is a regional or national card);
- Publishing prices;
- Having a call center,
- Having discounts on at least one brand-name and/or one generic drug in each therapeutic class; and

Fourth, a discount card issuer must agree to fund a consortium to, among other things, review marketing materials (presumably for compliance with some not-yet-developed standards).

70. The individual and cumulative effect of these requirements is to create a systematic and binding scheme to regulate prescription drug discount cards that can be endorsed for Medicare beneficiaries. In short, they create substantive rules for participation in a new government program. The fact that HHS intends to use a so-called private consortium to enforce them (after the first year) does not detract from their status as rules created and endorsed by HHS and CMS.

71. Regardless of the wisdom of, or authority for, creating the Card Program, HHS has acted illegally in failing to observe the notice and comment procedures of 5 U.S.C. § 553. The APA notice and comment procedures serve three important functions: (1) they give the

public an opportunity to both participate in the regulatory process and to receive meaningful feedback from the regulating agency through the solicitation and review of comments; (2) they enable the agency to educate itself on all issues before promulgating rules that will affect those parties that are regulated; and (3) they create a record for judicial review.

72. By adopting a substantive program without providing the public an opportunity to participate (indeed, by selectively permitting a small group of interested persons to participate in secret), HHS has frustrated each of these three important public goals. By denying Medicare beneficiaries and prescription drug providers an opportunity to comment in advance of adoption of the Card Program, all affected parties (except for the privileged few that were invited to participate) have been denied their statutory right to participate in the rulemaking process. At the same time, HHS has forfeited the opportunity to improve the Program by learning from the affected parties. Also, there is no record of the secret meetings for the Court to review.

73. Accordingly, HHS's Card Program must be declared illegal for having been adopted in violation of the procedural protections afforded by the APA. 5 U.S.C. § 706(2)(D).

74. The Secretary's implementation of this illegal Card Program has caused and will continue to cause substantial, imminent, and irreparable injury to NACDS's and NCPA's members unless the Card Program is declared unlawful and the defendants are permanently enjoined from implementing the Program.

## COUNT III (Against All Defendants)

### The Card Program Violates the Administrative Procedure Act Because It Is Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Not in Accordance with Law

75. Paragraphs 1 – 74 are incorporated by reference herein.

76. Assuming arguendo that the Court finds that the Secretary had statutory authority to create and implement the Card Program, and that he was not required to follow the rule-making requirements of the APA, the requirements established under the Card Program are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Indeed, these standards appear to have been designed for the express purpose of promoting the business interests of the Committee members, to the exclusion of other potential participants in the Card Program. Remarkably, none of these standards bears any relation to the ostensible purpose of the Secretary's initiative – i.e., to afford discounted drug prices to Medicare beneficiaries. Because the standards have nothing to do with which cards provide the best discounts, and actually limit access to discounts, they are arbitrary and capricious.

77. Under the requirements developed jointly by the Committee and the Secretary, only applicants that cover at least two million lives if serving as a national organization, or one million if participating as a regional organization, are permitted to participate in the Card Program. This unduly restrictive specification, which clearly is not necessary to assure that participants in the program are qualified to serve the beneficiaries, severely limits competition. There is no reasonable basis to conclude that organizations covering fewer lives, such as 500,000, would be ill-suited to participate in the Card Program.

78. In addition, the requirement that entities must be in business for five years to be eligible to participate in the Card Program is unreasonable, arbitrary, and capricious. The Secretary has asserted no reasonable basis for excluding issuers that otherwise satisfy all other requirements of the Program, including financial stability, but have been in business for fewer that five years.

79. Many of the standards set forth in the Notice of Application fail to identify the specific criteria for obtaining CMS's endorsement. To illustrate, the Notice requires that applicants demonstrate financial soundness, but does not specify the nature of the required showing. The Secretary's abject failure to delineate clear standards for qualification under the Card Program is plainly arbitrary and capricious.

80. Further, the Secretary has delegated significant regulatory authority under the Card Program to the Consortium of private participants that receive Medicare endorsement. Such a delegation of regulatory oversight authority to the very entities that are to be regulated is a clear abuse of discretion that runs afoul of the APA's requirements.

81. Accordingly, the Secretary's standards are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

82. The Secretary's establishment of the Card Program, which violates the APA, has caused and will continue to cause substantial, imminent, and irreparable injury to NACDS's and NCPA's members unless the Card Program is enjoined and declared invalid, and plaintiffs are provided such other relief as the Court deems necessary.

**COUNT IV (Against All Defendants)**

**The Card Program Was Formulated by a Secret Committee in Violation of the Federal Advisory Committee Act**

83. Paragraphs 1 – 82 are incorporated by reference herein.

84. The Federal Advisory Committee Act, 5 U.S.C. app. 2 § 1 *et seq.*, requires that federal officials, in creating an advisory committee,

a. set forth a clearly defined purpose for the advisory committee (5 U.S.C app. 2 § 5(b)(1));

b. require the membership of the advisory committee to be fairly balanced in terms of the points of view represented (5 U.S.C. app. 2 § 5(b)(2));

c. assure that the advice and recommendations of the committee will not be inappropriately influenced by the appointing authority (5 U.S.C. app. 2 § 5(b)(3));

d. provide for the duration of the committee and the publication of reports and materials (5 U.S.C. app. 2 § 5(b)(4));

85. The Federal Advisory Committee Act further requires:

a. that meetings of committees be open to the public (5 U.S.C. app. 2 § 10(a)(1));

b. public notice to insure that all interested persons are notified of meetings (5 U.S.C. app. 2 § 10(a)(2));

c. that interested persons be permitted to attend, appear before, or file statements with any advisory committee (5 U.S.C. app. 2 § 10(a)(3));

d. that detailed minutes be kept and documents be made available for public inspection (5 U.S.C. app. 2 §§ 10(b)-(c), 11).

86. Defendants Thompson and Scully repeatedly violated the Act by establishing and utilizing a body of advisors, the Committee, to provide advice on the establishment of the Program. That body continues to exist as the consortium of PBMs that have made a "deal" will receive HHS endorsement and will administer the Program under HHS supervision.

87. According to defendant Scully, the Committee participated in the drafting of the standards for endorsement under the Program.

88. Members of the Committee individually and collectively met secretly and repeatedly for several months leading up to the July 2001 announcement of the Card Program to advise the Secretary and Administrator regarding the Program.

89. On information and belief, the membership of the Committee consists of a small group of PBMs. No representative of community pharmacies, drug manufacturers, or of affected seniors, who will be affected greatly by this Program, is a member of the Committee.

90. The members of this Committee will be members of the government-supervised, Medicare-endorsed Consortium consisting of organizations that will offer benefits under the Program. The Consortium will operate as a quasi-public body overseeing the delivery of benefits under a federal program with federal oversight. The Committee, operated as an advisory committee, established and utilized to advise on the construction of the Program; will be the main participants in the Program; and will run the Program with federal endorsement and oversight.

91. The Committee was established without specific authorization by statute or by the President or as a matter of formal record by defendants.

92. Establishment of the Committee was not accompanied by timely notice in the Federal Register.

93. Committee meetings were held in secret, restricting access by members of the public and other interested parties.

94. Meeting transcripts, agendas, minutes, and other documents pertaining to the Committee's activities have not been made available to the public.

95. Composition of the Committee was not fairly balanced in terms of the points of view represented.

96. Under the Card Program, the Committee will continue to operate as the Consortium engaged in the delivery of prescription drugs, organized and operating under the direction of CMS and HHS.

97. The establishment and utilization of the Committee by defendants, and the Committee's conduct of its meetings in secret, without disclosure, and without fair composition violate the Federal Advisory Committee Act, 5 U.S.C. app. 2 § 1 *et seq.* (2001), and has caused, and will continue to cause, substantial, imminent and irreparable injury to plaintiffs and their members unless the Committee is enjoined and declared invalid.

**COUNT V (Against All Defendants)**

**The Card Program Violates the Administrative Procedure Act Because the Secretary Lacks Statutory Authority to Delegate Executive Authority to the Committee and the Consortium**

98. Paragraphs 1—97 are incorporated by reference herein.

99. The Secretary, through the Administrator, has established a Card Program targeted exclusively at beneficiaries who are eligible to receive benefits under Title XVIII of the Social Security Act. The Secretary, together with the Committee, has adopted rigid requirements for the Card Program and has delegated substantial authority for the administration of the Card Program to the Consortium, a private entity without any statutory authority.

100. The Consortium has substantial regulatory and oversight authority under the Card Program, as set forth in the documents released by HHS on July 12, 2001, the Notice of July 16, 2001, and the documents cited therein.

101. The regulatory and oversight authority of the Consortium includes:

First, the Consortium has the authority to operate a system to verify that beneficiaries are not enrolled in more than one Medicare-endorsed discount drug program;

Second, the Consortium has the authority to review marketing materials used by each Card Program issuer; and

Third, the Consortium has the authority to determine and assess fees on Medicare-endorsed card issuers.

102. The individual and cumulative effect of the Consortium's regulatory and oversight authority under the Card Program is to create a scheme whereby a loose affiliation of private entities will have substantial regulatory and oversight authority over the Card Program from which they gain to benefit. Such self dealing is an impermissible conflict of interest.

103. Nowhere does the Social Security Act or other legislative authority explicitly or implicitly authorize the Secretary to delegate regulatory or oversight authority to the Consortium for the purposes set forth in the Card Program or for any other purpose.

104. Although Congress occasionally has authorized the use of private entities to provide services to beneficiaries or otherwise assist in the administration of the Medicare Program, in each instance it has enacted statutory authority and prescribed parameters for the Secretary's interaction with and reliance on the private sector.

105. Accordingly, HHS's Card Program must be declared illegal for having been adopted in excess of statutory authority.

106. The unlawful delegation of authority by the Secretary has caused, and will continue to cause, substantial, imminent and irreparable injury to plaintiffs and their members.

**PRAYER FOR RELIEF**

107. WHEREFORE, plaintiffs pray that this Court: (1) declare the Medicare Rx Discount Card Program to be illegal; (2) preliminarily and permanently enjoin the Secretary and the Administrator from implementing the Card Program, including enjoining the acceptance and

review of applications pursuant to the July 16, 2001 Notice of Application; and (3) provide such other relief as the Court deems appropriate.

DATED: July 17, 2001

Respectfully submitted,

AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4045

By: Terence J. Lynam
Terence J. Lynam (D.C. Bar No. 253872)
Scott M. Heimberg (D.C. Bar No. 412204)
Jorge Lopez, Jr. (D.C. Bar No. 384765)
C. Fairley Spillman (D.C. Bar No. 384879)
Michael J. Parini (D.C. Bar No. 469227)

Alvin J. Lorman
Laura J. Oberbroeckling
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, PC
701 Pennsylvania Avenue, NW
Washington, DC 20004

S. Lawrence Kocot
Don L. Bell, II
Mary Ellen Fleck
NATIONAL ASSOCIATION OF CHAIN DRUG STORES
413 North Lee Street
Alexandria, VA 22314

John Rector
NATIONAL COMMUNITY PHARMACISTS ASSOCIATION
205 Daingerfield Road
Alexandria, VA 22314

Counsel for Plaintiffs